UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **JAY JOHANNIGMAN, MD,** | : | Case No. 1:19-cv-00280 |
| Plaintiff, | : | Judge Michael R. Barrett |
| v. | : | |
| **UNIVERSITY OF CINCINNATI PHYSICIANS, INC.,** *et al.,* | : | **MEMORANDUM IN OPPOSITION TO DEFENDANT UNIVERSITY OF CINCINNATI'S MOTION TO DISMISS** |
| Defendants. | : | |

## I. INTRODUCTION

For the reasons set forth below, Defendant University of Cincinnati should remain in this case. In the context of this litigation, UC does not act as an arm of the state, but as part of a conglomerate made up of UC College of Medicine, UC Physicians, and UC Health. All three Defendants are intricately interconnected as it concerns Dr. Johannigman's employment. Because a number of individuals, acting simultaneously as agents of UC and its co-defendants, are alleged to have violated Dr. Johannigman's rights, there is no clearly delineable public entity to be dismissed from this case.

For related reasons, UC's dismissal would frustrate the interest of judicial economy by creating parallel litigation in the Court of Claims that would examine the same questions—i.e., if the same actors, dually appointed at UC and UCP and/or UC Health, violated Dr. Johannigman's employment rights. This parallel litigation could lead to a judgment that conflicts with the judgment of this Court as to which defendants, if any, are liable, and what the appropriate relief should be. If any injunctive relief is ordered, it is unclear how UCP, as Dr. Johannigman's other employer, or UC Health, the entity in charge of UCMC, will comply if UC is not also bound.

In addition to these practical considerations, UC is properly before this Court for a number of other reasons: it has waived sovereign immunity over USERRA claims by entering into the domain of the federal government; it has not acted as an arm of the state with respect to Dr. Johannigman; and lastly, the state has already waived sovereign immunity in matters of military regulation.

## II. ARGUMENT

Defendant UC argues that it is an arm of the state entitled to sovereign immunity. This argument should not prevail for three reasons. First and most simply, UC has consented to suit under USERRA. By training medical personnel of the U.S. armed forces, UC has stepped outside of the traditional sphere of state sovereignty and into the sphere of the federal government. (See First Amended Compl., Doc. 4 at ¶¶ 35-38). As discussed below in Section A, UC has waived sovereign immunity from USERRA suits in federal court because it acts in the stead of the federal government with respect to uniformed service members.

Second, UC does not act as an arm of the state toward Dr. Johannigman. In the context of this litigation, UC is so entangled with private Defendants UCP and UC Health that the entities are impossible to distinguish. Many of the actors mentioned in the Complaint hold appointments with two or more Defendants, and it is often far from clear whether they were acting in their capacities as agents of UC, UCP, and/or UC Health. For example, Dr. Filak is both Dean of the College of Medicine and the President and Chairman of UCP. (First Amended Complaint, Doc. 4, ¶¶ 2-3). Both of these roles enable him to interfere with Dr. Johannigman's employment. (Id. at ¶¶ 89-91). Agents from all three organizations—Dr. Evaline Alessandrini (CMO of UC Health), Dr. Myles Pensak (CEO of UCP, Chief of Physician Services for UC Health, and Senior Associate Dean for Clinical Affairs at UC College of Medicine), and Rick Shumway (then the CAO of UCMC)—co-signed a letter declaring Dr. Johannigman could not perform surgery at UCMC. (Id. at ¶ 103).

Parsing out whether Drs. Filak and Pensak acted on behalf of UC, UCP, or UC Health in their handling of Dr. Johannigman's employment would be a purely academic exercise. The three entities acted without regard for such distinctions.

Additionally, because the remedy sought by Dr. Johannigman does not involve state funds—the most important factor in the "arm-of-the-state" analysis—the state's sovereignty is under little threat. As a result, Dr. Johannigman's claims are not barred by sovereign immunity.

Third, Congress has validly abrogated sovereign immunity for purposes of USERRA claims. Nothing in the statute precludes the exercise of jurisdiction, and the legislative history of the statute's 1998 amendments make congressional intent clear: federal courts must be able to enforce USERRA against state employers to prevent them from harming the federal government's ability to maintain non-career service members.

Fourth and finally, this abrogation is valid because USERRA was passed under Congress's War Powers. In ratifying the Constitution at the time of the Convention, the states ceded their sovereignty to the extent necessary to create a federal government. This ratification entailed the waiver of war powers to Congress, as memorialized in Article I, § 8, cls. 11-16 of the U.S. Constitution, under which USERRA was eventually passed.

### A. By stepping into the role of the federal government in training U.S. service members, UC has consented to litigation under USERRA.

States can consent to a federal court's jurisdiction by a voluntary act indicating waiver. *Univ. of Cincinnati v. Red Cedar Solutions Group, Inc.*, No. 1:14-cv-458, 2015 WL 736425, at *3-4 (S.D. Ohio 2015) (Litkovitz, M.J.).

Defendants contract with the U.S. Air Force to run several programs for the benefit of USAF and Department of Defense employees, including the Center for the Sustainment of Trauma and Readiness Skills ("C-STARS"). (Doc. 4, ¶ 35). Through C-STARS, medical personnel of the uniformed armed forces receive training from UC College of Medicine faculty and access to UC

3

Health facilities, and the trainees perform billable clinical duties at UCMC. (Id. at ¶ 37). There are financial benefits flowing to UC, as UC collects millions in Facilities and Administrative costs that come out of the federal research budget. (Id. at ¶ 38). The mere receipt of federal funds does not establish that a state has consented to suit, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985), but by training USAF and DoD personnel, UC is far more involved than that. And while "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights," *Edelman v. Jordan*, 415 U.S. 651, 673 (1974), these circumstances present the unusual case of consent by UC's knowing and voluntary foray into the federal government's domain of training members of the national armed forces. By stepping outside of the traditional sphere of state sovereignty, UC waives it, especially as to USERRA, the statute protecting service members.

### B. UC is not an arm of the state in the context of this litigation.

The typical factors for determining whether an entity is an arm of the state are: (1) the state's potential financial liability for a judgment against the entity; (2) the language used by state statutes and state courts to refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government. *See Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 760 (6th Cir. 2010). Sovereign immunity does not extend to a public entity that is not an arm of the state. *Id.*

Here, at least two factors, including the critical first factor, weigh in Dr. Johannigman's favor, negating UC's assertion that it is an arm of the state for purposes of this lawsuit.

#### 1. The requested relief does not implicate state funds.

Generally, the "most important" factor in the arm-of-the-state analysis is whether a prevailing plaintiff's damages would come out of the state treasury. *See Ernst v. Rising*, 427 F.3d 351, 365 (6th Cir. 2005). This factor necessarily requires an analysis of the nature of the relief sought. *See*

4

*Hall v. Medical Coll. of Toledo*, 742 F.2d 299, 304-05 (6th Cir. 1984) (examining whether a requested remedy would require defendant to dip into public coffers to satisfy the judgment). Here, this most important factor favors UC's participation in this case, as Dr. Johannigman does not seek monetary damages at all. Though fees and costs may be awarded by the Court, this monetary relief would be ancillary to the primary relief sought. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 279 (1989) (noting that "it must be accepted as settled that an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment.").

Defendant UC invokes *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), for the proposition that the nature of relief sought is immaterial to the question of whether sovereign immunity applies. However, in declining to order state officials to conform their conduct to state law, *Pennhurst* explicitly limited its holding to state law claims. *Id.* at 103-04, 106.[1] The *Pennhurst* Court took pains to distinguish state and federal law in the sovereign immunity context, even chastising the appellate court below for conflating the two. *Id.* at 104. The Court explained that exceptions to sovereign immunity, such as the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), have evolved to enable federal courts are empowered to vindicate federal rights. *Id.* at 105 ("Our decisions repeatedly have emphasized that the *Young* doctrine rests on the need to promote the vindication of federal rights."). *Pennhurst* has little to say as to whether Dr. Johannigman's request for injunctive relief under USERRA, a federal statute, is barred by sovereign immunity. And

---

[1] The Court framed its inquiry as "whether the claim that petitioners violated *state law* in carrying out their official duties at Pennhurst is one against the State and therefore barred by the Eleventh Amendment." *Pennhurst*, 465 U.S. at 103 (emphasis in the original). The Court ultimately concluded, "A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. . . . We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law." *Id.* at 106. Subsequent Sixth Circuit case law has acknowledged that *Pennhurst* is limited to state law claims. *See Ernst v. Rising*, 427 F.3d 351 (6th Cir. 2005) (citing *Pennhurst* and noting, "As requests for relief tied to state-law claims, we need not consider whether they are monetary or injunctive in nature, because they may not form the basis for an exception to state sovereign immunity in federal courts in either event.") (citing *Pennhurst*, 465 U.S. at 106).

because UC cannot be considered an alter-ego of the state where it acts as one with UCP and UC Health, Dr. Johannigman's state law claims under Ohio Rev. Code Ch. 4112 should not be barred.

### 2. The factors touching on state control do not clearly militate in favor of dismissal.

Dr. Johannigman does not dispute that state law refers to University of Cincinnati as a public entity or that the University's board is appointed by the state, but that does not end the inquiry. There are other indicia that UC, which did not join the state university system until the 1970s, enjoys significant autonomy from the state. Per Ohio Rev. Code § 3361.04, UC can independently enter into contracts, an indicator of autonomy considered in *Hall* and subsequent cases within the Sixth Circuit. *Hall*, 742 F.2d at 305; *see, e.g., Blackburn v. Floyd Cty. Bd. of Educ.*, 749 F.Supp. 159, 161 (E.D. Ky. 1990); *Hutchins v. Bd. of Trustees of Mich. State Univ.*, 595 F.Supp. 862 (W.D. Mich. 1984).

As for state control via purse strings, UC received only 17% of its funding (~$219 million) from the state in 2018; in contrast, it received approximately 32% of its funding (~$425 million) in the form of external research grants.[2] The College of Medicine also has significant autonomy; per its own materials, it received over $95 million in outside grants last year, much of it from the National Institutes of Health.[3] In fact, the College of Medicine has greater research and clinical trial award revenue than any other college at the University.[4] Unlike, for example, a state court or a state agency, UC is not so much an "alter-ego of the state" as a diversified research institution. In any event, these factors do not weigh heavily in favor or against granting sovereign immunity.

---

[2] University Current Funds Budget Plan FY 2018-2019, 14-17, https://www.uc.edu/content/dam/uc/af/budgetfinsvcs/docs/university_of_cincinnati_fy19_budget_book.pdf (last visited June 13, 2019).
[3] University of Cincinnati College of Medicine Research Annual Report 2018, 5, https://med.uc.edu/docs/default-source/research-documents/college-of-medicine-fy-2018-research-annual-report.pdf?sfvrsn=2 (last visited June 13, 2019).
[4] *Id.*

### 3. UC acted in a proprietary, rather than governmental, role with respect to Dr. Johannigman.

Next, courts consider whether the entity serves a governmental or proprietary function, which turns in part on its actions toward the plaintiff. *See Hall*, 742 F.2d at 305 ("Therefore, with respect to the expulsion of Mr. Hall as an MCO student on grounds of academic dishonesty, the school was certainly engaged in a traditional state activity."). While UC College of Medicine performs the public function of higher education for many of its constituents, it is an employer with respect to Dr. Johannigman. UC's alleged violations of law arise from its role as an employer, not as an educator. For example, UC is alleged to have violated state and federal law by taking Dr. Johannigman off of trauma call (a core work function), transferring his place of work from UCMC (the only Level I Trauma Center in the region) to West Chester (a Level III Trauma Center), and radically reducing his clinical duties. (Doc. 4, ¶¶ 33-34, 46-50, 89-91, 97, 101, 103, 106-116). All of Dr. Johannigman's claims arise entirely out of the proprietary employment relationship he shares with UC.

In light of this factor as well as the "most important" factor of damages weighing in Dr. Johannigman's favor, UC is not an arm of the state for purposes of this case. The conclusion is only bolstered by UC's indistinguishability from UCP and UC Health in its actions toward Dr. Johannigman, discussed above.

### C. Congress has validly abrogated sovereign immunity for purposes of USERRA claims.

Assuming for the sake of argument that UC is an arm of the state, it is not automatically entitled to sovereign immunity. Congress may abrogate sovereign immunity through a valid exercise of its powers. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996).

Congress abrogated sovereign immunity by the plain language of USERRA, and, as discussed in Section D, below, USERRA is a valid exercise of its plenary War Powers.

As for the statute's language, USERRA provides that an action by an individual against a state as an employer "may" be brought in a state court of competent jurisdiction. *Id.* at § 4323(b)(2). This permissive language should not be interpreted as language of exclusion. Because the natural reading of the clause is that a plaintiff "may" (and thus need not) sue a state employer in state court, employees should also be able to sue state employers under USERRA in federal court.

The legislative history of the amendments of USERRA make the intent behind this language clear. In 1998, Congress amended USERRA, including § 4323, to prevent the expansive sovereign immunity doctrine articulated in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996), from thwarting USERRA claims. The House Committee Report rejected two district court cases, *Velasquez v. Frapwell*, 994 F.Supp. 993 (S.D. Ind. 1998) and *Palmatier v. Mich. Dep't of State Police*, 981 F.Supp. 529 (W.D. Mich. 1997), which both relied on *Seminole Tribe* to hold that individuals could not sue state employers under USERRA in federal court. These courts so held notwithstanding their acknowledgment of Congress's clear intent to abrogate state sovereign immunity under those circumstances. *Velasquez*, 994 F.Supp. at 1005; *Palmatier*, 981 F.Supp. at 531. In apparent frustration, the House Committee Report noted:

> These decisions threaten not only a long-standing policy protecting individuals' employment right, but also raise serious questions about the United States' ability to provide for a strong national defense. . . . Accordingly, to assure that the policy of maintaining a strong national defense is not inadvertently frustrated by States refusing to grant employees the rights afforded to them by USERRA, the committee is favorably reporting this legislation.

*Risner v. Ohio Dep't of Rehab. and Corr.*, 577 F.Supp.2d 953, 960 (N.D. Ohio 2008) (quoting 105th Congress, House Report 105-448 to accompany H.R. 3213, March 17, 1998).

In light of this section's legislative history and its permissive language, the 1998 amendments reflect an intent "to push federal courts to exercise jurisdiction over USERRA claims brought by individuals against state employers, and if the courts fail in that duty, allow military personnel to file such claims in state courts." *Risner*, 577 F.Supp.2d at 960 (summarizing plaintiff's position, with

8

which it was "inclined to agree"). While the *Risner* court ultimately did not side with the plaintiff, exercising jurisdiction over UC on the basis of abrogation would be more consonant with the language of the statute and stated congressional intent.

> D. **The State of Ohio has waived sovereign immunity with respect to the regulation of the military by ratifying Congress's War Powers enshrined in Article I of the U.S. Constitution.**

Defendant UC asserts that it is protected by sovereign immunity from all of Dr. Johannigman's claims, relying on *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996) and *Alden v. Maine*, 527 U.S. 706 (1999).

UC's sovereign immunity argument stumbles with respect to Dr. Johannigman's USERRA claims. *Alden* and *Seminole Tribe* concerned statutes passed under the Commerce Clause—the Fair Labor Standards Act and the Indian Gaming Regulatory Act, respectively. By contrast, Congress passed USERRA under its plenary constitutional war powers. This distinction is important for a number of reasons.

The power to regulate commerce is shared between states and Congress. Art. I, § 8, cl. 3. The War Powers, on the other hand, are not. *See Peel v. Florida Dep't of Transp.*, 443 F.Supp. 451, 459 (N.D. Fla. 1977), *aff'd*, 600 F.2 1070 (5th Cir. 1979) (observing, with respect to the predecessor of USERRA, the Veterans' Reemployment Rights Act, "[t]he War Powers in the Constitution have been an area where the Congress traditionally wields supreme plenary power."). As a result, the War Powers hold an exceptional position within Article I. *See Jennings v. Ill. Office of Educ.*, 589 F.2d 935, 938 (7th Cir. 1979) ("the constitutional grant of war powers is sufficient to sustain a statute that might otherwise violate the Tenth Amendment which reserves to the states powers not delegated to the United States by the Constitution. . . . If the war powers prevail over a state's Tenth Amendment defense, they must equally prevail over a state's Eleventh Amendment defense, and the courts that have considered the matter have so held.") (citations omitted).

9

The first stated purpose of USERRA is "to encourage noncareer service in the uniformed services," which is consistent with Congress's constitutional power to "raise and support armies." 38 U.S.C. § 4301; Art. I, § 8, cl. 11.  The understanding of USERRA as a War Powers statute has a long history going back to its predecessor, the Veterans' Reemployment Rights Act.  *See Diaz-Gandia v. Dapena-Thompson*, 90 F.3d 609, 616 (1st Cir. 1996) ("The Eleventh Amendment immunity defense to the claim for damages fails as well. . . . Congress, acting pursuant to its War Powers, see U.S. Const. art. I, § 8, removed the Eleventh Amendment bar to damages actions brought under the VRRA.") (internal quotations omitted); *Jennings v. Ill. Office of Educ.*, 589 F.2d 935, 938 (7th Cir. 1979) (the VRRA was an instance of Congress "exercising legislative authority that is plenary within the terms of the Constitutional (war powers) grant.  Therefore, in this case the war powers serve as the vehicle for overriding the bar of the Eleventh Amendment.") (internal quotations omitted).

There is no dispute that *Alden* and *Seminole Tribe* represent the Supreme Court's rejection of Congress's attempts to abrogate sovereign immunity through Commerce Clause litigation.  In cases concerning non-Commerce Clause statutes, however, the Supreme Court has walked back the sweeping dicta of those cases.  In *Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356 (2006), the Court revisited *Alden* and *Seminole Tribe* and held that the U.S. Bankruptcy Code, which was passed under the Bankruptcy Clause, Art. I, § 8, cl. 4, effectively abrogated sovereign immunity.  Citing to the Federalist Papers, the Court found that states necessarily waived sovereign immunity defenses in bankruptcy proceedings when they ratified the Bankruptcy Clause of the Constitution.  *Id.* at 362-63.  The Bankruptcy Clause represented the states' choice to subordinate such defenses to the "pressing goal of harmonizing bankruptcy law."  *Id.* at 362.

Adopting the same historical approach and sources used in *Seminole Tribe*, *Alden*, and *Katz*, USERRA should be understood to validly override state sovereign immunity through the Constitution's grant of War Powers to Congress, Art. I, § 8, cls. 11-16.  These sources suggest that in

10

ratifying these clauses, the states ceded exclusive control to raise and regulate the military to the federal government. *See* The Federalist No. 23 (Alexander Hamilton) (a federal government charged with common defense must "be clothed with all the powers requisite" to raise and regulate armies); *see generally* Timothy M. Harner, *The Solder and the State: Whether the Abrogation of State Sovereign Immunity in USERRA Enforcement Action is a Valid Exercise of the Congressional War Powers*, 195 Mil. L. Rev. 91 (2008).

Accordingly, *Alden* and *Seminole Tribe*—which both held that Commerce Clause-based legislation does not abrogate sovereign immunity—say little about whether War Powers-based legislation does likewise. Instead, analogously to the states' collective waiver of regulatory authority over bankruptcy, the states' collective waiver of sovereign armies constitutes a waiver of sovereignty with respect to War Powers-based legislation.[5] Put more simply, because the State of Ohio consented through its admittance into the Union to Congress's War Powers, it has consented to legislation validly passed under those powers. As a result, Dr. Johannigman's USERRA claims are not barred by sovereign immunity in this Court.

### III. CONCLUSION

For the foregoing reasons, Plaintiff Dr. Johannigman respectfully requests that this Court deny Defendant UC's Motion to Dismiss.

---

[5] *But see Risner v. Ohio Dep't of Rehab. & Corr.*, 577 F.Supp.2d 953, 964 (N.D. Ohio 2008). The *Risner* Court thoughtfully analyzed waiver and abrogation under USERRA, but declined to extend the reasoning of *Katz* to War Powers legislation because of the dearth of historical evidence before it. For the reasons contained in this memorandum, the very same historical sources used in *Katz*, including the Federalist Papers, suggest that sovereign immunity is waived as to USERRA.

Respectfully submitted,

/s/ *Elizabeth Asbury Newman*
Randolph H. Freking (009158)
Elizabeth Asbury Newman (0096921)
FREKING MYERS & REUL LLC
600 Vine Street, Ninth Floor
Cincinnati, OH 45202
Phone: (513) 721-1975/Fax: (513) 651-2570
*randy@fmr.law*
*enewman@fmr.law*

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail, e-mail and/or facsimile to those parties who are not served via the Court's electronic filing system. Parties may access this filing through the Court's System.

/s/ *Elizabeth Asbury Newman*